IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

FEB 0 6 2017

Clerk, U.S. District Court
District Of Montana
Missoula



| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL,<br><br>Plaintiff,<br><br>. vs.<br><br>LESLIE WELDON, in her official capacity as Regional Forester of Region One U.S. Forest Service; UNITED STATES FOREST SERVICE, an agency of the United States; and MARY ERICKSON, in her official capacity as Supervisor of the Custer National Forest,<br><br>Defendants. | CV 16–106–M–DWM<br><br><br>OPINION<br>and ORDER |

Plaintiff Native Ecosystems Council ("Native Ecosystems") seeks injunctive and declaratory relief against Defendants LeAnne Martin, Regional Forester of Region One of the United States Forest Service, Mary Erickson, Supervisor of the Custer National Forest, and the United States Forest Service (collectively "the Forest Service") on the grounds the Forest Service failed to comply with the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA") when it approved the North Whitetail Post Fire

Project Salvage Sale ("Whitetail Project") in the Custer National Forest. Contrary to Native Ecosystems' assertions, the Forest Service met its statutory obligations.

## BACKGROUND

During the 2012 fire season, lightning ignited multiple wildfires that burned 312,418 acres around Ashland in southeastern Montana, including 143,200 on the Ashland Ranger District.[1] AR8855. The largest fire was the Ash Creek Fire, which burned 249,562 acres, 88,465 acres in the Ashland Ranger District. *Id.* The Ash Creek Fire burned across the Whitetail Project area as a mixed severity fire. *Id.* Areas that burned at moderate to high intensity resulted in extensive mortality of ponderosa pine, and the ponderosa pine in the northern and southern portions of the Project area is predominantly dead. *Id.* In contrast, the middle Project area burned at a "low to moderate intensity." AR8856. In 2014, the Forest Service completed the Ashland Post Fire Landscape Assessment to assess current conditions, trends, and management practices on the post-fire landscape. AR8855. The Assessment identified future management opportunities to aid in ecosystem restoration and to improve or maintain ecosystem resilience. AR8858. It did not discuss the Whitetail Project. *See* AR7549-7692.

_____

[1] The Ashland Ranger District is comprised of 436,546 acres of National Forest System lands. AR8855.

Following the 2012 fire, the Forest Service implemented three salvage sales in the vicinity: (1) in 2013, the Ashland Roadside Hazard Tree Abatement & Removal Projects, which cumulatively removed fire-damaged trees from 270 acres, AR12057-58, 12080-81; (2) in 2015, the Phoenix Salvage Sale, which permitted the harvest of up to 250 acres, AR12101-118; and (3) in 2016, the Whitetail Project, which permitted the harvest of up to 250 acres, AR8855-98. These sales were, at least in part, categorically excluded from NEPA review pursuant to 36 C.F.R. § 220.6(e)(13) ("Category 13"), which provides an exclusion for the "salvage of dead and/or dying trees not to exceed 250 acres [and] requiring no more than ½ mile of temporary road construction."

On April 29, 2016, a Scoping Notice was issued for the Whitetail Project.[2] *See* AR0011-0017; *see also* AR0001-04. And, on July 8, 2016, the Forest Service issued a Decision Memo authorizing the Project. AR8860, 8898. The Project proposes the cutting of 250 acres spread across a 5,288-acre area in the northern portion of the Ashland Ranger District. AR8859; *see also* AR8897-98 (mapping individual salvage harvest units). The Project is expected to last no more than two consecutive years, AR8874, and is purported to "[r]estore moderately to severely

---

[2] That Notice replaced one issued on January 27, 2016, that proposed two projects. AR0001. This litigation involves only the Whitetail Project.

burned areas to reduce long term downed fuel accumulations and re-establish

forest cover," and allow "[s]alvage up to 250 acres of ponderosa pine that were

killed by the Ash Creek Fire to reduce downed fuel accumulations and provide

timber projects to help support local communities," AR8859-60.

## STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Judicial review of agency actions under NEPA and NFMA is

governed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 706 *et seq.*

*See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011). Under

the APA, a "reviewing court shall . . . hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The scope of review is narrow, and a court should "not [] substitute its judgment

for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary or capricious:

only if the agency relied on factors Congress did not intend it to
consider, entirely failed to consider an important aspect of the problem,
or offered an explanation that runs counter to the evidence before the
agency or is so implausible that it could not be ascribed to a difference
in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011)

(quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).

An agency's actions are valid if it "considered the relevant factors and articulated

a rational connection between the facts found and the choices made." *Id.* (internal

quotation marks omitted).

## ANALYSIS

According to Native Ecosystems, the Forest Service's approval of the

Whitetail Project represents "death-by-a-thousand categorically excluded salvage

sales." (Doc. 34 at 6.) Native Ecosystems insists that the Forest Service has

violated its statutory mandate by improperly segmenting salvage sales and has

been living the "big lie" of grossly exaggerating the abundance of suitable habitat

for the black-backed woodpecker and minimizing the impact of those salvage

sales. (*Id.* at 16-17.) While raising important questions about the application of

categorical exclusions to temporally and geographically similar projects, Native

Ecosystems' concerns are not borne out by the facts here. The Forest Service's

decision to proceed under Category 13 was neither arbitrary nor capricious.

## I.    Extra-Record Materials

Due to Native Ecosystems' ubiquitous reliance on information presented in

extra-record materials, that issue is addressed first.

Courts reviewing agency action under the APA must generally limit their review to the administrative record on which the agency based the challenged decision. *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). Limiting a court's review to the administrative record "ensures that the reviewing court affords sufficient deference to the agency's action. The APA gives an agency substantial discretion 'to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary view more persuasive.'" *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (quoting *Marsh v. Or. Natural Resource Council*, 490 U.S. 360, 378 (1989)). Here, Native Ecosystems submitted two extra-record expert declarations by Chad Hanson regarding the black-backed woodpecker. (Docs. 28, 35.) Extra-record declarations by scientists are of heightened concern as they implicate the deference due the agency and essentially lead to de novo review of the agency's action rather than the more deferential review required by the APA. *Asarco, Inc. v. E.P.A.*, 616 F.2d 1153, 1160 (9th Cir. 1980).

Nevertheless, courts can consider extra-record evidence in four narrowly construed circumstances: if "(1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical

terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency." *Fence Creek Cattle Co.*, 602 F.3d at 1131. While the first and third exceptions are implicated here, Hanson's declarations fail to meet the exception requirements.[3]

Invoking the third exception, Native Ecosystems explains that parties are permitted to submit expert opinions for the purpose of explaining technical terms or complex subject matter presented in the scientific documents of the administrative record. (Doc. 34 at 14 (citing *Inland Empire Public Lands Council v. Glickman*, 88 F.3d 697, 703-04 (9th Cir. 1996)). Native Ecosystems does not, however, explain how Hanson's declarations perform that limited function. Rather, the declarations go beyond mere explanation and instead challenge the underlying science and data used by the agency. They may not be considered pursuant to this exception. *See Asarco*, 616 F.2d at 1159 (allowing explanation so long as it contains "no new rationalizations").

Alternatively, Native Ecosystems argues that the declarations are necessary to determine whether the agency considered all relevant factors or failed to consider an important aspect of the problem, insisting "it is not possible to

---

[3] Native Ecosystems also cites out-of-record authorities in its introductory material. (*See* Doc. 34 at 4-6.) Those prefatory assertions are not relevant to this action and are not considered.

demonstrate what an agency failed to consider by being tethered to what they did

consider." (Doc. 34 at 12.) However, instead of merely asking the Court to

review the declarations to show that the agency failed to consider a relevant factor,

Native Ecosystems asks the Court to use the declarations as a basis for challenging

the wisdom and/or correctness of the Forest Service's scientific analysis. To do so

would be improper:

> Although the relevant factors exception permits a district court to
> consider extra-record evidence to develop a background against which
> it can evaluate the integrity of the agency's analysis, the exception does
> not permit district courts to use extra-record evidence to judge the
> wisdom of the agency's action. This distinction is a fine, but important,
> one. Reviewing courts may admit evidence under this exception only
> to help the court understand whether the agency complied with the
> APA's requirement that the agency's decision be neither arbitrary nor
> capricious. *But reviewing courts may not look to this evidence as a
> basis for questioning the agency's scientific analyses or conclusions.*

*San Luis*, 776 F.3d at 993 (internal citations omitted) (emphasis added). Hanson's

declarations criticize the science underlying the Forest Service's cumulative

effects analysis. They do not support the proposition that the agency failed to

consider relevant factors, but rather that its consideration of those factors was

scientifically unsound. That is exactly the type of extra-record material this Court

is not allowed to consider and it will not be considered here.

The Forest Service also filed two expert declarations in support of its

scientific analysis, authored by William Stasey. (*See* Docs. 31, 37.) Insofar as

Stasey's declarations explain technical or complex terms, they may be considered.

*Inland Empire*, 88 F.3d at 703-04. Analysis beyond that in the agency's decision-

making record, however, is not considered. *San Luis*, 776 F.3d at 993; *Asarco*,

616 F.2d at 1159. Regardless, the Administrative Record on its own is adequate to

support the agency's decision here.

## II.    NEPA

NEPA is a procedural statute that does not "mandate particular results, but

simply provides the necessary process to ensure that federal agencies take a hard

look at the environmental consequences of their actions." *Neighbors of Cuddy*

*Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002) (internal quotation marks

omitted). NEPA provides that all federal agencies shall prepare, for every major

federal action significantly affecting the quality of the human environment, an

environmental impact statement ("EIS") that addresses, *inter alia*, the

environmental impact of the proposed action and potential alternative actions. 42

U.S.C. § 4332(C). Federal agencies may prepare an environmental assessment

("EA") to determine whether an EIS is required. 40 C.F.R. § 1508.9.

Alternatively, an agency may invoke a "categorical exclusion" to NEPA if

an action falls within "a category of actions which do not individually or

cumulatively have a significant effect on the human environment." 40 C.F.R.

§ 1508.4. An agency must first "determine the scope of the issues to be addressed

and identify[] the significant issues related to a proposed action." 40 C.F.R.

§ 1501.7; *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007). When an

agency decides to proceed under a categorical exclusion, it is required to

adequately explain its decision, and ensure "extraordinary circumstances" do not

exist in which a normally excluded action may have significant environmental

effects. *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 853-54 (9th Cir.

1999); 40 C.F.R. § 1508.4.

Here, the Forest Service categorically excluded the Whitetail Project under

36 C.F.R. § 220.6(a), which permits the exclusion of a proposed action "from

further analysis and documentation in an EIS or EA only if there are no

extraordinary circumstances related to the proposed action" and the action falls

within one of a number of enumerated categories. AR8885-86. The Forest

Service concluded the Whitetail Project fell within 36 C.F.R. § 220.6(e)(13)

("Category 13"), which provides a categorical exclusion for the "salvage of dead

and/or dying trees not to exceed 250 acres [and] requiring no more than ½ mile of

temporary road construction." AR8886. Native Ecosystems insists an EA was

necessary, arguing first that the Forest Service improperly segmented salvage sales

-10-

to avoid preparing an EA, and second, that the Project will have significant cumulative effects on the black-backed woodpecker.

## A. Segmentation

Native Ecosystems first argues that the Forest Service improperly segmented the salvage sales to avoid preparing an EA, and that is was arbitrary and capricious not to consider the 2013 roadside salvage, the 2015 Phoenix Project, and the Whitetail Project as connected, cumulative, or similar actions.[4] *See* 40 C.F.R. § 1508.25.

The determination of whether projects are distinct is a fact question implicating agency expertise. *Conservation Congr. v. U.S. Forest Serv.*, 2013 WL 2457481, at *11 (E.D. Cal. June 6, 2013); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). The agency's discretion is limited pursuant to NEPA's implementing regulations, however, which provide that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action, shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a). And, in determining the scope for an EIS, agencies are required to consider three types of actions: "connected actions," "cumulative actions," and

---

[4] Native Ecosystems' opening brief addresses only "similar" actions, while its response/reply argues "cumulative" or "connected" actions.

"similar actions." 40 C.F.R. § 1508.25.

An action is "connected" if it automatically triggers other actions which may require an EIS, if it cannot or will not proceed unless other actions are taken previously or simultaneously, or if it is an interdependent part of a larger action upon which it depends for its justification. 40 C.F.R. § 1508.25(a)(1). Native Ecosystems makes no showing that any of these requirements are met here. Nor does the record show an interdependence between the projects. An action is "cumulative" if, when viewed with the other proposed impacts, it has cumulatively significant impacts. 40 C.F.R. § 1508.25(a)(2). Here, the Forest Service determined that cumulative impacts were not significant because, *inter alia*, the projects affected less than 2% of highly suitable black-backed woodpecker habitat within the 90-kilometer cumulative effects area. AR8878-79, 2212-13. The adequacy of that analysis is affirmed below. Finally, an action is "similar" if "when viewed with other reasonably foreseeable or proposed agency actions [it] ha[s] similarities that provide a basis for evaluating the environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3). While the salvage projects likely meet this definition, this regulation provides that an agency "*may* wish to analyze these actions in the same impact statement," and only "*should* do so" if it is the best way to adequately

assess the combined impacts. *Id.* (emphasis added); *see Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 1001 (9th Cir. 2004) (holding that for "similar" actions, as opposed to "connected" or "cumulative" actions, "an agency should be accorded more deference in deciding whether to analyze such actions together). Here, the Forest Service determined independent project analyses was preferred. It is not apparent that it acted arbitrarily in doing so. *Alaska Ctr. for Env't*, 189 F.3d at 858 n.5; *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 1001 ("[W]e are unable to conclude that analyzing the projects together is necessarily the 'best way' to evaluate them. More precisely, we cannot say that the [agency] acted arbitrarily in thinking otherwise.").

Native Ecosystems insists that the Ninth Circuit's opinion in *Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1996), requires the salvage projects to be considered together. In *Blue Mountains*, the Forest Service approved multiple salvage logging projects in the same area without completing an EIS. The Ninth Circuit concluded the EA inadequately addressed cumulative impacts, and that the agency was required evaluate the impacts of the sales in a single EIS. 161 F.3d at 1215. The court focused on the fact that the sales were "reasonably foreseeable," "were developed as part of a comprehensive forest recovery strategy," and the estimated sale quantities and

timelines were set prior to the completion of the EA. *Id.*

Unlike the situation in *Blue Mountains*, the record supports the Forest Service's position that the Whitetail Project was not reasonably foreseeable at the time of the 2013 and 2015 salvage projects, or the creation of the 2014 Ashland Post Fire Landscape Assessment. Native Ecosystems insists the Whitetail Project was foreseeable because the cutting unit Map Key is dated "2015" in the Administrative Record Index, *see* AR8933, the Ashland Post Fire Landscape Assessment addressed future management issues, AR7549, and the treatment of these same areas was proposed in pre-fire timber sales, AR8863. However, the Forest Service explained that the 2015 date in the index reflects the date of the "NAIP Imagery" used to show the cutting units. The cutting unit maps themselves show mapping occurred on March 29, 2016. *See* AR8911. Moreover, while the Ashland Post Fire Landscape Assessment addressed future management issues, it does not mention the Whitetail Project but rather states that the commercial value of fire-killed trees begins to deteriorate and become unsuitable for timber product recovery about 12 to 18 months after the fire. AR7605. This language indicates that logging in 2016/17 was not expected to be feasible. Additionally, the Phoenix Project Decision Memo does not mention the Whitetail Project, *see* AR12108, 12116, and while activity was proposed in this area prior to the 2012 fire, the

record shows that the nature of the landscape and type of activity has changed.

Native Ecosystems further argues that the temporal and geographical proximity of the projects requires they be considered together. Although the Whitetail and Phoenix project areas abut one another, the Whitetail Project entails salvage of 250 acres across a 5,288-acre area, AR8897, 8949, while the Phoenix Project entails salvage of 250 acres across a 1,696-acre area, AR12156. The closest cutting units are a quarter-mile apart. And, while the roadside salvage occurred in the same area, it was in part based on roadside hazard tree removal and had different project purposes. AR12083-84, 12060-61. Nevertheless, Native Ecosystems' concerns were generally met during the scoping process, which "addresses the risk that similar salvage projects, over both time and geographic areas, will cause significant cumulative impacts on the environment." *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1221 (10th Cir. 2006). These same regulations "preclude the breaking down of projects into small component parts to avoid cumulative significance." *Id.* (citing 40 C.F.R. § 1508.27(b)(7) (in evaluating the significance of impact, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts . . . Significance cannot be avoided by . . . breaking [a project] down into small component parts")); *see also* 68 Fed. Reg.

145, 44604 (July 29, 2003) ("[S]egmenting a larger project into smaller projects in order to meet the acreage requirements and be considered under these [categorical exclusions] is contrary to Forest Service guidance."); *see also Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006) (explaining that collective impacts from a large number of small projects are addressed by the "extraordinary circumstances" safety valve). Here, the Forest Service addressed the cumulative effects of the Project. The sufficiency of that analysis is discussed below.

## B.    Cumulative Effects

NEPA allows a federal agency to adopt a categorical exclusion for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. A "cumulative impact" "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). Native Ecosystems' challenge to the Forest Service's cumulative effects analysis is two-fold. First, Native Ecosystems insists the existence of cumulative effects, however minor, mandates the preparation of an EA. Second, Native Ecosystems argues that the agency's conclusion that there were no

significant effects or uncertainty of effects was arbitrary and capricious.

Calling this a "case of first impression," Native Ecosystems first argues that once the Forest Service determines that a proposed Category 13 timber sale will have cumulative effects on the environment, as is the case here, it is required to prepare an EA to study and analyze the potential significance of those cumulative effects. *See* AR2209, 2212-13, 8878 (recognizing impact on black-backed woodpeckers); AR2214 (recognizing that the Project will have "minimal" cumulative effects on black-backed woodpeckers). But, the mere existence of cumulative effects does not mandate an EA. An EA is required only if there will be significant effects or there is uncertainty as to whether the cumulative effects of the proposed action will be significant. 36 C.F.R. § 220.6(c).

Native Ecosystems argues "significance" must be presumed under Category 13 if salvage activity in the area—not necessarily the project area—exceeds 250 acres. In support of its position, Native Ecosystems relies on the Tenth Circuit's opinion in *Colorado Wild*, where the court deferred to the Forest Service's proposed brightline of 250 acres for Category 13 exclusions based on the agency's argument that "direct, indirect, and cumulative effects arise from acres of activity and not the number of projects." 435 F.3d at 1216. Native Ecosystems persuasively argues that, under the Forest Service's own analysis in *Colorado*

-17-

*Wild*, contiguous and continuous 250-acre salvage projects have cumulative

effects. But it is not clear that courts must presume *significant* cumulative effects

under those facts. Rather, the significance of the effects depends on the particular

facts of a specific project and the scoping performed in each instance. "Once the

agency considers the proper factors and makes a factual determination on whether

the impacts are significant or not, that decision implicates substantial agency

expertise and is entitled to deference." *Alaska Ctr. for Env't*, 189 F.3d at 857, 859

("[A]n agency's interpretation of the meaning of its own categorical exclusion

should be given controlling weight unless plainly erroneous or inconsistent with

the terms used in the regulation."). Here, the Forest Service determined the

cumulative effects would not be significant. The propriety of that decision must

be assessed under the specific facts of this Project.

The Forest Service is required to take a "hard look" at the proposed

project's effects and "may not rely on incorrect assumptions of data." *Native*

*Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005); 40

C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and

public scrutiny are essential to implementing NEPA."). "When an agency decides

to proceed with an action in the absence of an EA or EIS, the agency must

adequately explain its decision." *Alaska Ctr. for Env't*, 189 F.3d at 859. In doing

so, it "must supply a convincing statement of reasons why potential effects are insignificant." *Id.* (internal quotation marks omitted). To determine whether agency action is arbitrary or capricious, courts consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378. Native Ecosystems argues that the Forest Service's decision is "built on a foundation of incorrect assumptions and inaccurate scientific analysis." (Doc. 34 at 14).

The parties primarily dispute the amount of suitable habitat for the black-backed woodpecker in and around the Project area. Native Ecosystems insists the agency cannot rely on the widespread availability of suitable habitat across the region, but at the same time, that the Forest Service erred by not considering cumulative effects on a similarly large scale. Not only is Native Ecosystems' position inconsistent, but the Forest Service considered the proper factors in deciding to proceed under Category 13, specifically that there were no extraordinary circumstances or significant cumulative effects that would require the preparation of an EA or EIS.

While the scoping document for the Whitetail Project does not address the Phoenix or roadside salvage sales, AR001-018, the Forest Service did not avoid performing cumulative review, *see* AR8878. Rather, the Forest Service

determined that the cumulative impacts are expected to be minimal because the combined area of the Whitetail, Phoenix, and roadside hazard projects affect less than 2% of the highly suitable black-backed woodpecker habitat within the 90-kilometer cumulative effects area. AR8878-79, 8887, 2212-13. Native Ecosystems argues, however, that the Forest Service improperly applied Latif (2012),[5] improperly relied on Samson (2006),[6] conflated home range size with pair density, and should have performed a field survey.

In regard to Latif, Native Ecosystems argues the Forest Service should have relied on the authors' most conservative (7% habitat suitability) as opposed to their most liberal (70% habitat suitability) habitat estimate, and that the Forest Service ignored Latif's assertion that "Wildfires containing the largest total acreage of suitable habitat may be primarily important for species persistence." AR1498; (*see* Doc 34 at 19.) However, the Forest Service explained that it did not apply the Latif figures as argued by Native Ecosystems because Latif did not consider the 2012 fires. AR1497, 2210. Rather, the agency applied the model to recent fires within a 90-kilometer radius, explaining its process for doing so. *See*

---

[5] Quresh S. Latif et. al, *Potential Black-backed Woodpecker Nesting Habitat in Recently Burned Forests of Eastside Montana (Final)* (March 2012).

[6] Fred B. Samson, *A Conservative Assessment of the Northern Goshawk, Black-backed Woodpecker, Flammulated Owl, and Pileated Woodpecker in the Nothern Region, USDA Forest Service* (Sept. 24, 2006).

AR 2210-11, 8879. Second, while Native Ecosystems can disagree with Samson's conclusion as to the number and suitability of remaining snags, *see* AR1924, Samson's analysis and its bearing on black-backed woodpecker habitat is adequately explained. *See* AR2209-15. Third, the record discusses habitat needs in terms of nesting and breeding territories, *see* AR2210, 8878, and it is unclear that applying Native Ecosystems' preferred approach would alter any of the agency's conclusions.

Finally, Native Ecosystems argues that the Forest Service should have performed field surveys to better understand the habitat requirements of the woodpecker. The Forest Service can use habitat as proxy for measuring a species' population, so long as it describes both "the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *Lands Council v. McNair*, 629 F.3d 1070, 1081 (9th Cir. 2010) (internal quotation marks omitted). The Wildlife Report explains that habitat preference for black-backed woodpeckers is "burned areas with high densities of snags for nesting and foraging." AR2212. The Forest Service determined 2,019 acres in the Project area met this criteria, or 34.3 percent of the entire area. *Id.* But, salvage activity is expected in only 250 acres, or 3.5% of the suitable nesting habitat in the project area. *Id.* The Wildlife Report further

explains that: (1) not all habitat in the area is "highly suitable"; (2) not all habitat is eliminated in cutting areas; and (3) while proposed salvage "has [the] potential to negatively impact black-backed woodpeckers," the post fire habitat is used for only a limited time period. *See* AR2212-13. The Forest Service also considered ponderosa pine coverage more generally:

> The [Project] salvage harvest occurs on 5.8 percent of the ponderosa pine coverage in the project area. When combined with the Phoenix Project and roadside hazard tree removal, salvage harvest will impact 1.5 percent of the ponderosa pine coverage within the 2012 Ash Creek fire perimeter. When combined with the noncommercial treatments and broadcast burning authorized under a separate decision, the total amount of treatments affect 10.3 percent of the ponderosa pine coverage in the project area/ 7.2 percent of the ponderosa pine coverage within the Ash Creek Fire perimeter.

AR8874. Additionally, the Forest Service concluded that "[t]he proposed action will maintain and improve habitat for most species across the landscape. The resulting habitat matrix is expected to be adequate for all wildlife resources. . . . Abundant nesting and foraging habitat for black-backed woodpeckers will remain in the project area and cumulative effects area." AR8874. Finally, the agency noted that no future harvest is anticipated because the fire-killed trees are now too degraded to be merchantable. AR8888.

While a project may have significant environmental impacts where its effects are "highly uncertain or involve unique or unknown risks," 40 C.F.R.

§ 1508.27(b)(5); *Blue Mtns. Biodiversity Project*, 161 F.3d at 1213, the Forest Service adequately explained why that is not the case here, *see* AR8878-80; 2210-15. The agency took the requisite hard look under NEPA.

## II.    NFMA

NFMA provides for forest planning and management at two levels: the forest level and the individual project level. 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the agency develops a Land and Resources Management Plan, i.e., "forest plan." Once the forest plan is approved, the Forest Service implements the plan by approving or denying site-specific actions. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). The Forest Service's failure to comply with a forest plan violates NFMA. *Native Ecosystems Council*, 418 F.3d at 961. The Project area is subject to the Custer National Forest Management Plan ("Custer Forest Plan"). Native Ecosystems argues that the Forest Service did not use the best available science and failed to adequately address the habitat needs of the black-backed woodpecker. The record supports the Forest Service's determination that the Project would not violate the Forest Plan.

### A.    Best Available Science

Native Ecosystems argues that the Forest Service did not use "the best

available scientific information" in considering the amount of suitable habitat necessary for the black-backed woodpecker as required by NFMA regulations, 26 C.F.R. § 219.3.[7] The black-backed woodpecker is identified as a Forest Service sensitive species on the Custer Gallatin National Forest. AR2194, 2209. The Decision Memo and Wildlife Report explain why and how the agency applied the habitat models it chose to use. *See* AR8878-80, 8883, 2209-15. Additionally, the record shows the agency considered the 1995 Hutto article relied on by Native Ecosystems, *see* AR2209, 1292-1388, explained why Samson habitat estimates are accurate for the black-backed woodpecker, *see* AR2051, and addressed concerns raised by opposing scientific information raised during the comment period, AR8878-80. The Forest Service also specifically highlighted the unique relationship between the black-backed woodpecker and stand-replacing fires, stating "it would be difficult to find a forest bird species more restricted to a single habitat type in the northern Rockies than the black-backed woodpecker is to early post-fire conditions." AR2209; *see also* AR1293. Moreover, most of Native Ecosystems' argument relies on the scientific opinions of its own expert—Hanson, which are not properly before the Court. *San Luis*, 776 F.3d at 993; *see also*

_____

[7] In contrast, as discussed above, NEPA regulations merely demand information of "high quality" and professional integrity. *See* 40 C.F.R. §§ 1500.1(b), 1502.24; *see* 73 Fed. Reg. 61292, 61295 (Oct. 15, 2008) ("NEPA itself does not required the use of 'best available data.'").

*Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency

must have discretion to rely on the reasonable opinions of its own qualified

experts even if, as an original matter, a court might find contrary views more

persuasive."). Native Ecosystems fails to show that the Forest Service did not

apply the best available science.

## B.    Forest Plan Compliance[8]

"The [Custer National] Forest has the responsibility to manage the land to

maintain at least viable populations of existing native and desirable non-native

vertebrate species . . . ." AR9553. A "viable population" is defined as "[a]

population which has adequate numbers and dispersion of reproductive

individuals to ensure the continued existence of the species population in the

planning area." AR9684. Moreover, almost all of the salvage harvest is located in

lands designated as "MA D," which stands for "Management Area D."[9] AR8889,

9057 (list by harvest unit). Management Area D is "a multiple use management

area that includes areas that are important to the perpetuation of selected wildlife

and fish species." AR8889, 9590. The goal of the management area "is to

---

[8] Native Ecosystems did not address this argument in its response/reply. (*See* Doc. 34.)

[9] 0.87 acre of the salvage is located in Management Area G. AR8889. The goal of Management Area G "is to manage [] areas for the maintenance and improvement of a healthy diverse forest and source of wood products for dependent local markets." AR8890.

maintain or improve the long-term diversity and quality of habitat for the selected species identified by the Ranger District, as well as accommodate other resource management activities such as timber harvest, livestock grazing, and oil and gas development," recognizing that "[s]ome short-term habitat impacts may be necessary to achieve long-term wildlife goals." AR8890, 9590. While the "selected species" for the Ashland District is the mule deer, the Plan requires other wildlife and fish species, including the black-backed woodpecker, to be considered. AR9590. In order to implement those standards, silvicultural prescriptions are to "identify timber treatments that will perpetuate or improve key wildlife habitats" when selected for harvest. AR9591.

Native Ecosystems argues that the Project is inconsistent with the Forest Plan because the stands selected for harvest provide the best habitat for black-backed woodpeckers and the Project neither maintains nor improves that habitat. *See* AR2212 (describing Whitetail cutting units as "highly suitable" habitat). The Forest Service determined that "[t]he Project is consistent with all applicable [Management Area] D standards," relying on the analysis from the Wildlife Report. AR8890. As emphasized by the Forest Service, and contrary to Native Ecosystems' position, the standards outlined by the Forest Plan and the resource concerns addressed under Management Plan D are not just for black-backed

-26-

woodpeckers. While severely-burned, dense stands targeted by the Project constitute key black-backed woodpecker habitat, AR2209, 2212, 12200, the Forest Service weighed that fact against the existence of black-backed woodpecker habitat in the area and the management needs for other species and resources, *see* AR8887, 8897, 2210. For example, the Project is expected to improve habitat for mule deer, which "use unburned forest in higher proportion than the current transitional forest type." AR2220; *see also* AR8881. Because Management Area D emphasizes divergent habitat and resource needs, it does not mandate the particular habitat requirements argued by Native Ecosystems. AR9590.

Moreover, Native Ecosystems' reliance on *Alliance for the Wild Rockies v. Cottrell*, 623 F.3d 1127, 1135 (9th Cir. 2011), is unpersuasive. *Cottrell* addressed human use and enjoyment of discrete sections of a forest, finding irreparable harm where a project would prevent such use and enjoyment of a specific acreage. 623 F.3d at 1135. Unlike the aesthetic and recreational issues at issue in *Cottrell*, the Forest Service explains how the habitat needs of the black-backed woodpecker are met throughout a 90-kilometer dispersal area, *see* AR8897, 12281, 2243A, across varying levels of habitat suitability (high, moderate, low), AR2210, and how the Project's impacts, even cumulatively, would not affect the woodpecker's viability, AR2214, 8887. Native Ecosystems fails to show that the Forest Service's decision

that the Project met the requirements of both the Forest Plan and Management

Area D standards was arbitrary and capricious in light of their mixed-use mandate.

## CONCLUSION

Use of a categorical exclusion to avoid necessary review would be

improper. Even so, Native Ecosystems' concerns are not borne out by the facts of

this case. The Forest Service's decision to segment the salvage projects, its

conclusion that the salvage projects will not have significant cumulative effects,

and its determination that its actions were consistent with the Forest Plan were

neither arbitrary nor capricious.

Accordingly, IT IS ORDERED that the Forest Service's motion for

summary judgment (Doc. 29) is GRANTED and Native Ecosystems' motion (Doc.

25) is DENIED.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter

judgment against the plaintiff and in favor of the defendants and close this case.

Dated this ____ day of February, 2017.

_13:09 P.M._

Donald W. Molloy, District Judge
United States District Court